Filed 5/18/23 Modified and Certified for Pub. 5/23/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Jonathan C.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE<br><br>     Plaintiff,<br><br>v.<br><br>JONATHAN C.M.,<br><br>     Defendant and Appellant;<br><br>CONTRA COSTA COUNTY PROBATION DEPARTMENT<br><br>     Intervener and Respondent. | A165931<br><br>(Contra Costa County Super. Ct. No. J16–00144 |

Under the California Fostering Connections to Success Act, certain dependents and wards of the juvenile court are allowed to remain under the court's jurisdiction and receive financial assistance as "nonminor dependents" until they turn 21 years old, so long as they meet eligibility requirements. (*In re Leon E.* (2022) 74 Cal.App.5th 222, 225, 229 (*Leon E.*), citing Assem. Bill No. 12 (2009–2010 Reg. Sess) and Assem. Bill No. 212 (2011–2012 Reg.

Sess); *In re R.G.* (2015) 240 Cal.App.4th 1090, 1092; Welf. & Inst. Code,[1] § 303, subd. (b); § 11403.)  This benefits program is often referred to as "AB12." (*Leon E.*, at pp. 225.)  When a nonminor ward remains under juvenile court jurisdiction to receive AB12 benefits after termination of the wardship, the continuing jurisdiction is called "transition jurisdiction." (*Id.* at p. 227, fn. 4; § 450).

Jonathan C.M. appeals from a juvenile court order terminating transition jurisdiction.  He contends the juvenile court erred, first, in holding a hearing on termination in his absence and, second, in terminating transition jurisdiction without considering his best interests.  Because we find his second contention has merit, we need not address the first.  We will reverse and remand to allow the juvenile court to consider whether to terminate jurisdiction taking into account Jonathan's best interests.

## FACTS AND PROCEDURAL HISTORY

Jonathan was born in 2003.  It is undisputed that he began displaying symptoms of autism spectrum disorder and other mental health and developmental conditions as a very young child and that he suffered a chaotic childhood characterized by neglect, abuse, and homelessness.  Jonathan has been diagnosed with autism, ADHD, oppositional defiant disorder, mood disorder, and tic disorder, and he has an extensive history with the dependency and juvenile delinquency systems.  As a minor, he was placed in various foster care group homes and ran away multiple times.

In December 2020, Jonathan (already a dependent of the juvenile court) pleaded no contest to two counts of assault by means of force likely to

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

produce great bodily injury. The juvenile court committed him to the Youthful Offender Treatment Program (YOTP) in juvenile hall.

In December 2021, the probation department (probation) requested authority to release Jonathan to home supervision for the last phase of the YOTP. Probation noted that Jonathan was eligible for extended foster cares services and informed the court, "Probation is prepared to offer AB 12 services to the youth via reentry process."[2]

In January 2022,[3] Jonathan was released to a sober living environment facility for 90 days of home supervision under the YOTP.

In March, probation reported that Jonathan had completed the YOTP. Jonathan continued to attend therapy, applied to a few jobs, and expressed interest in automotive mechanics. Probation found Jonathan had "made progress" since his arrest in 2020, and, upon returning to the community, he had continued to rebuild his relationship with his mother, engaged in therapy, and used community resources. Probation wrote that Jonathan was "making strides in the positive direction." But probation also recognized Jonathan "still has room to grow and make improvements on his decision making skills." Probation recommended that the court terminate Jonathan's wardship and exercise transition jurisdiction over Jonathan as a nonminor dependent.

At a hearing on March 15, the juvenile court followed probation's recommendation. Jonathan's wardship was terminated, and the juvenile

---

[2] On December 14, 2021, Jonathan signed a "Voluntary Re-entry Agreement for Extended Foster Care," which provided that AFDC-FC benefits would begin to be paid as of the date he is "placed in a supervised foster care setting." He also signed a "Transitional Independent Living Plan and Agreement."

[3] Further dates are in 2022.

court continued jurisdiction over Jonathan as a nonminor dependent. A nonminor dependent review hearing was set for May 24.

The next day, Jonathan told a probation officer he did not want to continue living in the sober living environment. The officer told Jonathan he "could technically live wherever he chooses" as he was no longer a ward of the court but cautioned that "not every place he wants to live would be approved as a Supervised Independent Living Placement" (SILP).[4] Jonathan moved in with an adult male friend in Concord and did not request that the residence be assessed for qualification as a SILP.

On April 4, Jonathan reported to probation that he was working at a landscaping company but did not provide paystubs. He said he was taking classes at Fast Eddies, where he was learning automotive repair, but he was "reluctant" to provide information about his living situation. On April 23, Jonathan texted probation that he was no longer working, he was not taking class at Fast Eddies, and he had lost his housing. Probation sent Jonathan information on shelters and emergency housing, but he did not respond.

On April 27, a probation officer sent Jonathan a text message informing him that probation would recommend terminating AB12 services at the May 24 nonminor dependent review hearing. At this point, Jonathan had been a nonminor dependent under transition jurisdiction for only six weeks. The next day, Jonathan told probation he could not live in a shelter and the only thing he needed was a job. Jonathan would not tell the probation officer where he was living.

_____

[4] To be eligible for AFDC-FC, a nonminor dependent must be placed in an acceptable type of housing; the list of acceptable types of housing includes "[a]n approved supervised independent living setting for nonminor dependents." (§ 11402, subd. (e).)

4

Jonathan missed an appointment with probation on May 3.  Probation asked whether he would like to reschedule.  As of May 11, Jonathan had not responded.

In anticipation of the nonminor dependent review hearing, probation filed a memo with the court recommending terminating jurisdiction.  Probation wrote, "At this juncture, it is evident through Jonathan's lack of engagement, he does not wish to continue in this voluntary program.  Jonathan has stated he wants the benefits of utilizing the program, but his actions and behavior indicate[] he is not willing to uphold his obligations set forth in the mutual agreement or case plan."

At the scheduled review hearing on May 24, Jonathan was present via Zoom.

Jonathan's attorney reminded the court that Jonathan had autism spectrum disorder (ASD), a history with the dependency system, and a history of homelessness.  She argued, "So I think that he is in desperate need of AB–12, and I'm hoping that you would not follow the recommendation and give Jonathan another chance to comply with the requirements."  She reported that Jonathan was trying to get a job and explained that "the manifestations of his ASD [sometimes] come across as being uncooperative and not wanting to comply with probation" but that was not his intent.

The juvenile court suggested that rather than terminate jurisdiction that day, it would continue the hearing on termination to give Jonathan time to comply with the requirements of AB12.  Jonathan's attorney responded, "[W]e would appreciate that opportunity.  I know that Jonathan wants AB–12 and wants to comply, so we would take that opportunity to show you that he's serious about his efforts."  The court recognized that the quality of communication between Jonathan and probation may be affected by his ASD

5

and expressed hope that Jonathan's attorney could "help facilitate so that nothing is lost in the communication . . . from probation."

The probation officer agreed that Jonathan "needs AB–12 services" but stated, "right now he's just not doing enough."

The court continued the hearing on termination to June 24.

In June, probation prepared an update for the court about Jonathan's actions since the May 24 hearing.[5] On June 7, Jonathan reported to his assigned probation officer that he was working for a landscaping service in Pittsburg, but as of June 21, he had not provided any documentation of his employment. Similarly, he said he was enrolled in an automotive mechanics program at Fast Eddies but did not provide documentation. Jonathan continued to be unwilling to share basic information. Probation reported that, when asked about his living situation and employment in person, Jonathan "will deflect and change the subject," and when asked over text message, he "will simply ignore questions."

At the continued hearing on June 24, Jonathan was present. According to the juvenile court minute order, Jonathan requested to put the matter over, the juvenile court granted the request, and the hearing was continued to July 8.

At the next continued hearing on July 8, Jonathan was not present. His attorney requested a continuance because of Jonathan's failure to appear. She stated that she believed there was an issue with his cell phone as he had confirmed with her that he intended to appear for the hearing. The juvenile court granted the request and set the next hearing for July 15.

---

[5] The probation memo was signed by Jonathan's assigned probation officer on June 21, but the memo apparently was not filed with the court until July 15, 2022.

At the continued hearing on July 15, Jonathan was not present. His attorney stated Jonathan was "unable to appear," but his mother was present. The probation officer reported that probation had texted and emailed Jonathan a couple of times that week without response and that Jonathan also missed an appointment for an interview with a transitional housing provider.

Jonathan's attorney told the court she was "surprised that Jonathan was not present" at the July 8 hearing because he "always made all of his court dates after he was released from YOTP." She was in contact with Jonathan's mother, who "explained that Jonathan's phone is not working, and that explained why he was unable to appear last Friday [the July 8 hearing]" and "why he's unable to appear today." Jonathan's attorney requested another continuance. She recognized the court might be frustrated with Jonathan but emphasized that he needed AB12 services.

The juvenile court terminated AB12 services. The court explained, "[T]he law requires him to meet certain requirements, and he hasn't been meeting those requirements, and he's had multiple opportunities." The court noted that Jonathan could come back to court to request AB12 services as soon as he meets the eligibility criteria and, "Hopefully we'll see Jonathan back soon back on AB–12."

## DISCUSSION

A.  *Statutory Background*

"Before 2008, most dependent children 'emancipated' from—i.e., became ineligible for—foster care on their 18th birthday. In 2008, in order to improve outcomes for children who aged out of foster care, Congress passed the Fostering Connections to Success and Increasing Adoptions Act of 2008 (Pub.L.No. 110–351 (Oct. 7, 2008) 122 Stat. 3949). Among other things, the

7

2008 act provided federal funding to reimburse states for part of the cost of providing maintenance payments to eligible youths who remained in foster care after their 18th birthdays, so long as those youths had not yet reached their 21st birthdays and were either enrolled in school, employed at least 80 hours a month, or participating in 'an activity designed to promote or remove barriers to employment.'  (Congressional Research Service, Child Welfare: The Fostering Connections to Success and Increasing Adoptions Act of 2008 (P.L. 110–351) (Oct. 9, 2008) p. 9.)"  (*In re A.A.* (2016) 243 Cal.App.4th 765, 772–773.)

California enacted AB12 to take advantage of this expanded federal foster care funding.  (*In re A.A., supra*, 243 Cal.App.4th at p. 773.)  To be eligible to receive financial support under AB12, a nonminor dependent must satisfy at least one of the following eligibility requirements: "(1) The nonminor is completing secondary education or a program leading to an equivalent credential.  [¶] (2) The nonminor is enrolled in an institution that provides postsecondary or vocational education.  [¶] (3) The nonminor is participating in a program or activity designed to promote, or remove barriers to employment.  [¶] (4) The nonminor is employed for at least 80 hours per month.  [¶] (5) The nonminor is incapable of doing any of the activities described in paragraphs (1) to (4), inclusive, due to a medical condition, and that incapability is supported by regularly updated information in the case plan of the nonminor."  (§ 11403, subd. (b); *Leon E., supra*, 74 Cal.App.5th at pp. 229–230; *In re K.L.* (2012) 210 Cal.App.4th 632, 638.)

Participation in the AB12 program is voluntary.  (*In re H.C.* (2017) 17 Cal.App.5th 1261, 1267–1268.)  "It is the intent of the Legislature, both at the time of initial determination of the nonminor dependent's eligibility and

8

throughout the time the nonminor dependent is eligible for aid . . ., that the social worker or probation officer . . . and the nonminor dependent shall work together to ensure the nonminor dependent's ongoing eligibility.  All case planning shall be a collaborative effort between the nonminor dependent and the social worker [or] probation officer . . . with the nonminor dependent assuming increasing levels of responsibility and independence."  (§ 11403, subd. (a).)

Section 391 "authorizes the termination of [nonminor dependent] jurisdiction in only three specific circumstances."  (*In re Nadia G.* (2013) 216 Cal.App.4th 1110, 1118.)  These are (1) "the nonminor does not wish to remain subject to dependency jurisdiction," (2) "the nonminor is not participating in a reasonable and appropriate transitional independent living case plan," or (3) "after reasonable and documented efforts the nonminor cannot be located."  (§ 391, subds. (e)(1)(A), (e)(1)(B), (f).)

B.    *Best Interests*

Section 202, subdivision (d), provides, "Juvenile courts and other public agencies charged with enforcing, interpreting, and administering the juvenile court law shall consider the safety and protection of the public, the importance of redressing injuries to victims, and the *best interests* of the minor in all deliberations pursuant to this chapter [which encompasses transition jurisdiction and termination of jurisdiction over nonminor dependents]."  (Italics added.)

For any hearing during which the termination of the juvenile court's jurisdiction over a nonminor dependent is considered, the probation officer's report must address "[w]hether remaining under juvenile court jurisdiction is in the nonminor's best interests and the facts supporting the conclusion reached," and the juvenile court's written findings and orders on termination

9

of jurisdiction likewise must include "[w]hether remaining under juvenile court jurisdiction is in the nonminor's best interests and the facts in support of the finding made." (Cal. Rules of Court, rule 5.555(c)(1)(A), (d)(1)(B).)

Jonathan contends the juvenile court erred as matter of law in terminating jurisdiction because no consideration was given to whether termination of the dependency was in his best interests. We agree.

In the absence of any evidence to the contrary, we presume the court is aware of and complies with the law. (*People v. Jones* (2017) 3 Cal.5th 583, 616.) But, here, neither the parties nor the court ever mentioned Jonathan's "best interests" at the May 24 or July 15 hearing. Further, in its memo filed with the court May 24, probation used a form with boxes to check next to suggested findings it recommended that the court make. One line recommended a finding that "Remaining under juvenile court jurisdiction" either "is" or "is not" "in the non-minor's best interest." Probation checked the box for "is." This may have been a typographical error, but in any event, probation did not identify *any* facts supporting a conclusion that Jonathan remaining under juvenile court jurisdiction was not in his best interests. In its update filed July 15, probation continued to recommend that the court make a finding that remaining under juvenile court jurisdiction "is" in the nonminor's best interest and continued to fail to identify any facts to support its conclusion.

Although the juvenile court's July 15, 2022, written findings and orders on preprinted form JV-367 (printed findings) include a statement (at line 11) that remaining under juvenile court jurisdiction "is not" in the nonminor's best interests, the printed findings do not appear to be a complete or accurate record of the court's findings and orders. For example, the printed findings specify (at line 7) that the court read the probation report filed May 24, 2022,

10

but do not mention the update filed July 15, 2022. The printed findings include a checked box (line 34. c.) indicating the nonminor "meets the eligibility criteria for status as a nonminor dependent but is not participating in a reasonable and appropriate Transitional Independent Living Case Plan," but that was not the stated basis of the court's ruling at the July 15 hearing. Rather, the juvenile court clearly stated that it found "the minor in this case does not meet the eligibility criteria for status as a non-minor dependent." Yet, the printed findings include a box for a suggested finding that the nonminor "does not meet the eligibility criteria for status as a nonminor dependent" (line 34 a), and that box is *not* checked. Under these circumstances, we conclude the printed findings are not a reliable reflection of what the juvenile court actually found. (Cf. *In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1241, fn. 5 ["under the circumstances the juvenile court's comments and orders stated at the dispositional hearing prevail over the order contained in the clerk's transcript"].)

The printed findings provide at line 11 that remaining under juvenile court jurisdiction is not in the nonminor's best interests. Line 11 continues, "The facts supporting this determination were stated on the record." But, as we have described, there was no discussion of Jonathan's best interests on the record.

Under these circumstances, it is apparent that neither probation nor the juvenile court fulfilled its duty to consider Jonathan's best interests. Accordingly, we will remand to allow the juvenile court to decide whether to terminate jurisdiction considering Jonathan's best interests.

Jonathan further requests that this court order that probation expedite a regional center assessment. This request should be presented to the juvenile court in the first instance. Jonathan further suggests probation

11

should have helped him apply for Supplemental Security Income and food stamps and that his already appointed court-appointed education attorney could have been involved in his case. These arguments, too, should be presented to the juvenile court in the first instance.[6]

## DISPOSITION

The order terminating transition jurisdiction is reversed. We may direct immediate issuance of the remittitur if the parties so stipulate. (See Cal. Rules of Court, rule 8.272(c)(1).) In light of the short period remaining before Jonathan's 21st birthday, we strongly encourage the parties to so stipulate.

---

[6] In a lengthy discussion in the final section of Jonathan's opening brief on appeal, his appellate counsel asks, "[w]hat *would* have been in Jonathan's best interest?" The brief continues with a detailed list, all of which may be presented to the juvenile court on remand. It includes "Prioritizing completion of an assessment by the regional center, for one thing. A regional center assessment had been court-order in April 2021 . . . But in December 2021, while Jonathan was waiting to be released from the YOTP program facility, the regional center assessment had still not been completed. The probation officer blamed 'technical issues with internet' for this. [¶] Regional center services should have been put in place f[or] Jonathan while he was a NMD or a delinquent ward. . . . Jonathan was entitled as a disabled NMD who suffered from the developmental condition of autism, as well as a life-long hearing impairment, to free and appropriate special education and related services including regional center services for youth with autism, hearing disabilities and other specified conditions under the federal Individuals with Disabilities Education Act (IDEA) and its California statutory corollaries in the Education Code and implementing rules of court. [citations] . . . [¶] . . . [¶] Jonathan will not be able to navigate the regional center process on his own. He is at high risk of becoming lost to the streets, shelter, hospitals, prisons, and being a public charge – all fates that could have been avoided had he received the regional services he needed as a child and teenager."

                            _____

                            Miller, J.

WE CONCUR:


_____

Richman, Acting P.J.


_____

Markman, J.*


A165931, *People v. Jonathan C.M.*

---

* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13

Filed 5/23/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Jonathan C.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE<br><br>        Plaintiff,<br><br>v.<br><br>JONATHAN C.M.,<br><br>        Defendant and Appellant;<br><br>CONTRA COSTA COUNTY PROBATION DEPARTMENT<br><br>        Intervener and Respondent. | A165931<br><br>(Contra Costa County Super. Ct. No. J16–00144<br>ORDER GRANTING PUBLICATION AND MODIFYING OPINION |

BY THE COURT:

The opinion in the above-entitled matter filed on May 18, 2023, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

It is also ordered that the opinion filed herein on May 18, 2023, be modified as follows:

1

In the 11th line of footnote 6 on page 12, after the first word, "NMD", insert "[(nonminor dependent)]".

This modification does not change the judgment.


Dated:_____                    _____
                                               Richman, Acting P.J.


A165931, *People v. Jonathan C.M.*

Court:  Contra Costa County Superior Court

Trial Judge:  Hon. Wade M. Rhyne

Deborah Dentler, under appointment by the Court of Appeal, for Defendant and Appellant

Steven P. Rettig, Assistant Contra Costa County Counsel; Amee L. Choi, Deputy County Counsel, for Intervener and Respondent

A165931, *People v. Jonathan C.M.*